SAM R. GIBSON, Appellee, v. AMERICAN RAILWAY EXPRESS COMPANY, Appellant.

**CORPORATIONS:** Consolidation—Liability of New Company. The
1  American Railway Express Company, which, during the World War, and under Federal sanction, took over the property and business of various express companies, in consideration, among other things, of assisting "*in the liquidation of the current assets and liabilities*" of said various companies, thereby impliedly obligated itself to pay the pre-existing judgments against said companies, at least to the extent of the assets taken over.

**CORPORATIONS:** Consolidation—Liability for Debt. Principle af-
2  firmed that one corporation may not purchase and take over all the property and business of another corporation and pay therefor by the issuance of its own corporate stock, and escape liability for the existing debts of the merged corporation, to the extent of the property so taken over.

*Appeal from Shenandoah Superior Court.*—FREDERICK FISCHER, Judge.

MAY 8, 1923.

PLAINTIFF seeks by an action in equity to subject the property of the defendant to the payment of a judgment obtained

by the plaintiff against the Adams Express Company which corporation was subsequently merged in the defendant by agreement of the parties pursuant to the provisions of Federal statutes. Judgment and decree entered in favor of the plaintiff. Defendant appeals.—*Affirmed.*

*Wilson & Keenan,* for appellant.

*Ferguson, Barnes & Ferguson,* for appellee.

DE GRAFF, J.—This action is in equity and was commenced by the plaintiff to subject the property of the defendant corporation to the payment of a judgment entered in favor of the

1. CORPORATIONS: consolidation: liability of new company.

plaintiff for $1,233.40 against the Adams Express Company. The original action was predicated on the negligence of the Adams Express Company in handling a shipment of mules from Shenandoah, Iowa to Buffalo, New York. A judgment was obtained in the Superior Court of the city of Shenandoah on December 20, 1917, and an appeal was taken to this court. The judgment was affirmed. *Gibson v. Adams Exp. Co.* 187 Iowa 1259. An execution issued, but no property belonging to the Adams Express Company being found within the jurisdiction of the state of Iowa, it was returned *nulla bona.* This was the provocation for the instant suit.

At the threshold it is necessary to understand the relation and privity between the Adams Express Company as defendant in the original suit, and the American Railway Express Company defendant in the case at bar. This relationship and the alleged liability sought to be imposed is predicated on a contract to which specific reference is necessary. This contract had its origin during the World's War and was one of its results during the progress thereof. This fact, however, is not material to the determination of the issues presented except that it would be futile to claim actual fraud in the inception and consummation of the contract.

It will be remembered that on December 28, 1917 the president of these United States acting under the powers conferred on him by the Constitution and statutes took possession and

assumed control of certain railroads and systems of transportation in the United States, and on March 29, 1918 the president authorized the then director general of the railroads to make any and all contracts or agreements which in any way were necessary or expedient in connection with the Federal control of systems of transportation.

Many of the railroads were previously operated by companies which had by written contracts agreed to furnish to certain express companies privileges, facilities, and transportation for the carrying on of the express transportation business in the United States. By reason of this fact the railroad companies were unable, except through the director general, to perform these contracts, and it was determined in view of public interests and the necessities of the government in time of war that the conduct of the express transportation should also be placed under Federal control. The express companies welcomed the invitation of the director general, and it was agreed that the express transportation business of the country could be more efficiently carried on through the agency of a single corporation which should act as the sole agent of the government and of the companies.

On the 21st day of June 1918 a memorandum of agreement was entered into between the director general acting on behalf of the United States and certain express companies, to wit: The Adams Express Company, The American Express Company, The Southern Express Company, and Wells Fargo & Company.

The contract provided that the express companies should "as soon as possible after the date hereof, cause to be organized a corporation, for the purpose of carrying on for the director general the express transportation business upon the railroads and systems of transportation under Federal control, and elsewhere as may be determined by the director general, in connection with the express transportation business thereupon," with a capital stock not exceeding $40,000,000 of which "the shares shall be subscribed and purchased at par by the express companies before named."

They further agreed to transfer to the "new corporation all property owned and used by them, respectively, in carrying

on their express transportation in the United States, including supplies and material on hand,'' but not ''cash or treasury assets.'' The value as of November 30, 1917 was estimated at $30,000,000, and property purchased during the intervening period was to be taken by the new corporation at ''cost, less accrued depreciation.''

In payment the new corporation was to issue its stock to the express companies, ''sufficient to pay at par for the property so transferred to it, and to provide the cash necessary for working capital,'' and ''from time to time thereafter, as additional funds may be necessary to purchase additional property or reimburse the company for additional property purchased or for working capital, additional stock may be issued by said new corporation,'' with the approval of the director general.

The new corporation was to handle all express business with the railroads under Federal control and the express companies were to cancel all contracts with Federal controlled railroads and to assign to the new corporation ''as far as possible, all contracts with any railroad, water, or electric lines not taken over by the government, and shall not engage in the express transportation business during the period of contract between the director general and said new corporation, except upon the approval of the director general, or when necessary to carry out a contract with a line not taken over by the government, and which they are unable to assign or cancel.''

The express companies also agreed to promote the ''employment of said new corporation of such of their officers, agents, and employees as may be necessary to the carrying on by it of said transportation business aforesaid.'' They also retained the right to ''employ the said new corporation as the agent of said express companies in their foreign business, and for the handling of money orders and other financial paper, and for such other purposes as may be desired,'' subject to the approval of the director general.

The contract further provided: ''It is the intention that the provision herein made for carrying on the express transportation business through the agency of a single corporation shall continue in effect only during the period of Federal control, and nothing herein contained shall be construed as sanction-

ing any combination or merger of the properties or business of the express companies to last beyond that period."

It was also agreed that upon the termination of Federal control the properties agreed to be conveyed to the new corporation, or the equivalent of such property, should be reconveyed by the new corporation to the companies at a valuation to be agreed upon or in the event of disagreement to be fixed by the interstate commerce commission.

The new corporation was organized and approved by the interstate commerce commission, and on July 25, 1918 the Adams Express Company conveyed to the new corporation (defendant herein) "the express transportation business now conducted by it in the United States of America and adjacent foreign countries, including the good will thereof, all the said real estate and buildings, fixtures, appurtenances, automobiles, horses and trucks, materials and supplies on hand, and personal property of every name and description, except cash and treasury assets, used in the conducting of said business and owned by said company, for and in consideration of $8,707,000 par value of the capital stock in the American Railway Express Company, * * * and other good and valuable considerations, to wit, the services of the said American Express Company in assisting in the liquidation of the current assets and liabilities of the said Adams Express Company and the assuming of the leases and railroad contracts of the said Adams Express Company used by it in the operation of its express transportation business."

The foregoing recitals constitute the essential provisions of the contracts upon which plaintiff bases his right of recovery from the defendant corporation.

Question stated: Is the defendant answerable to the plaintiff for the liability of the Adams Express Company on a valid judgment existing at the time that the defendant took over the entire tangible property and business of the Adams Express Company under the contract in evidence?

We answer in the affirmative. It is conclusively shown that the new corporation did not undertake to pay anything for the property transferred to it by the con-

2. CORPORATIONS: consolidation: liability for debt.

stituent corporations except its own capital stock. Only by a transfer for value can the prop-

erty of a corporation be transferred so as to defeat the claims of creditors. Corporate assets constitute a trust fund to the extent that creditors are entitled in equity to payment of their debts before any distribution of corporate property is made among stockholders, and creditors have the right to follow such assets or property into the hands of anyone who is not a holder in good faith and for value within the legal meaning of that phrase. It would be a matter of mere bookkeeping for the new corporation to charge a merging corporation with a liability paid by the former under the contract in the instant case. That contract contemplated a reconveyance upon the happening of certain conditions, and further provided for the method of reconveyance. A different situation would arise if sufficient property had been left in the possession of a constituent company to take care of its legal liabilities upon a merger. In such instance the remedy of the creditor would not be impaired.

The defendant corporation was formed for the purpose of doing the business of the express companies which entered into the contractual relationship. The constituent companies received all the earnings of the new corporation and these companies were mere conduits between the new corporation and the stockholders respectively of the constituent companies.

The certificates of stock issued by the new corporation and presumably held by the constituent companies to whom the same were issued were held in trust for the respective stockholders, but it makes no difference whether the certificates have been passed on to those who are entitled to them. These certificates are but the written evidence of ownership of things tangible constituting the assets of an entity created by law. A levy under an execution against corporate assets does not contemplate stock in the hands of the individual owners.

Nor are we concerned with the proposition that the constituent companies in the instant case did not surrender their charters. They did go out of existence to the extent that they ceased to do business as prescribed by their charters and ceased to own tangible property through which their business could be conducted. They did not cease to be *de jure* when the new corporation was formed, but there was a de-facto termination and a voluntary abandonment of the business intended and designed

by their charter. They existed *de jure* for the purpose of winding up their affairs, if necessary, and for the purpose according to the contract of merger to have reconveyed their properties under the terms of the contract in the event the occasion ever required. The termination of the existence of the constituent companies was not necessary to the accomplishment or the validity of a consolidation or to constitute the new corporation a continuation of the old corporations. A consolidation is something more than a shadow of a legal technicality.

We cannot escape the conclusion that the contract in question created a consolidated corporation, and it necessarily follows that the new corporation assumed all the liabilities of the constituent companies at least to the extent of the properties transferred respectively by said companies. The contract resulted in the creation of a corporation which became the owner of the stock, property, rights, and privileges of the constituent companies and through which the conduct of the corporate enterprise of the constituent corporations was placed under a single management.

The only consideration that passed was the stock at par value issued by the new corporation. This cannot be viewed as a purchase for value and unless the transaction may be so viewed it constitutes constructive fraud upon existing creditors at the time of the transfer of the tangible assets. It was not therefore a purchase and sale as distinguished from a consolidation. There is no particular magic in the words used in the contract although it is quite apparent from that language and from the language of the statutes which brought the new corporation into being that a consolidation was intended.

The act of Congress of 1920 which created the power and authority of the interstate commerce commission to approve and authorize the consolidation of two or more carriers was expressly extended and applied "to the consolidation of four express companies into the American Railway Express Company, a Delaware corporation, if application * * * is made to the commission within 30 days after the passage of this amendatory act; and pending the decision of the commission such consolidation shall not be dissolved." 41 Stat. at L. 482, Section 407, Subdivision 7.

The statute expressly conferred power on the commission

"to approve and authorize the consolidation." This authorized the approval of something already in existence or the authorization of something to come into existence and the only thing referred to is a consolidation. There is no mention made of consolidation of property if this technical distinction need be noted.

It is our conclusion therefore that Congress had in mind not a mere sale of property from one corporation to another, which was a means to an end, but a consolidation of corporations by which their property and identity, so far as necessary to create a consolidation, passed to the new corporation. We will presume that Congress used the word consolidation in its legal sense.

Mere procedural matters in effecting a consolidation are not controlling, but are to be considered in the decision of the point in issue. The true ground upon which the instant obligation rests is in the agreement, express or implied, of the new corporation to pay the legal liabilities of the constituent companies. Under the contract with the Adams Express Company which conveyed all of its tangible property to the new corporation, except cash and treasury assets, it was agreed that the Adams Express Company "for and in consideration of $8,707,000 par value of the capital stock in the American Railway Express Company, a corporation organized under the laws of Delaware, and other good and valuable consideration, to wit, the services of the said American Railway Express Company in assisting in the liquidation of the current assets and liabilities of the said Adams Express Company, and the assuming of the leases and railroad contracts of said company used by it in the operation of its express transportation business, has bargained and sold," etc.

The term liquidation has a fairly defined legal meaning, and as applied to a corporation means the winding up of the affairs of the corporation by reducing its assets, paying its debts and apportioning the profit or loss. To liquidate is to pay and settle; to extinguish an indebtedness.

Construing as we do that this constituted an agreement on the part of the new corporation to assume the debts of the selling corporation the instant liability clearly attaches. There is

abundant authority, however, for the proposition that where one corporation for its own stock and bonds purchases all of the assets of another, without provision for the debts of the latter, the various circumstances of the case imply full knowledge on the part of the purchasing corporation of all facts necessary to charge the property in its hands with the debts of the selling corporation. Such a transaction is out of the ordinary course of business, and it is a salutary rule that the creditors of the old corporation cannot be required to look alone to the stock and bonds which were substituted for the real tangible assets of that corporation. We prefer to predicate the liability in the instant case on the express assumption of the debt rather than on legal implication, but the new corporation took *cum onere* under either theory.

The court of last resort in three of the states of the American Union has had occasion to determine the propositions involved in the instant case and on records involving the contracts before us. These decisions are replete with authorities bearing on the propositions decided herein.

The conclusion reached in *American R. Exp. Co. v. Commonwealth,* 190 Ky. 636 (228 S. W. 433) and in *American R. Exp. Co. v. Downing,* (Va.) 111 S. E. 265 harmonize with the numerical weight of modern authority and are consonant with the very right of the matter. The conclusion reached in *McAlister v. American R. Exp. Co.,* 179 N. C. 556 (103 S. E. 129) is contra.

We are satisfied that the defendant corporation is answerable to the plaintiff for the liability of the Adams Express Company as recited in the judgment upon which the instant case is predicated and for the reasons stated in this opinion. Wherefore the judgment entered by the trial court is—*Affirmed.*

PRESTON, C. J., WEAVER and STEVENS, JJ., concur.