MABEL I. WILCOX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELSIE H. WILCOX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GAYLORD P. WILCOX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 96827, 96830, 96831. Promulgated March 14, 1941.

932

*Urban E. Wild, Esq., Milton Cades, Esq.,* and *E. R. Cameron, C. P. A.,* for the petitioners.

*B. H. Neblett, Esq.,* for the respondent.

OPINION.—The question for our determination under this issue is whether the distribution which Inter-Island made to its stockholders, as described above, was a taxable dividend within the meaning of section 115 of the Revenue Act of 1934. This section of the statute reads in material part as follows:

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDENDS.—The term "dividend" when used in this title (except in section 203 (a) (4) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

(b) SOURCE OF DISTRIBUTIONS.—For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117 (a), 100 per centum of the gain so recognized shall be taken into account in computing net income. * * *

    *       *       *       *       *       *       *
(i) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

Section 115 (g) provides that if a corporation:

* * * cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

The contention of the petitioners is that the distribution in question was a distribution in partial liquidation of Inter-Island within the meaning of section 115 (c) above, that it should be applied against the cost or other basis of their shares, and that they realized no taxable income from the distribution.

The respondent, on the other hand, contends that the distribution was "at such time and in such manner" as to make the distribution "essentially equivalent to the distribution of a taxable dividend" within the meaning of section 115 (g). This contention is apparently predicated upon the fact that a large part of the company's earnings after March 1, 1913, had been capitalized through stock dividends and at the time of the distribution in 1934 there was no business reason for a reduction in the par value of the shares of stock, and at the time the company had sufficient surplus earnings from which the distribution could have been made. The respondent does not contend that the reduction in the par value of the shares and the distribution here in question was in any wise connected with the payment of stock dividends in earlier years. The last of such stock dividends was declared and paid in 1922 and at that time the company was rapidly expanding its fixed assets and had a need for additional capital.

The balance sheet of Inter-Island at December 31, 1933, shows a surplus of $520,374.28. But the company's insurance reserves at the same date were in the amount of $1,350,000. These did not

represent any liability. They simply represented an appropriation of a part of the surplus of the company to provide against losses which might be sustained in the future. Prior to about 1925 Inter-Island acted as its own insurer. After the company acquired larger steamships it took out policies with marine insurance companies to cover a part of the risks. The insurance reserves were merely a part of the company's surplus. It must be held therefore that Inter-Island could have made the distribution in 1934 from surplus had it desired to do so.

The crux of our question is, as the petitioners submit, whether the distribution made in 1934 was made in partial liquidation of the corporation, so that the amounts distributed should be treated "as in part or full payment in exchange for the stock" under the provisions of subsection (c) above.

A partial liquidation is defined in subsection (i) of section 115 as "a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." The question is whether the last clause of the above quoted section should be interpreted to mean "or one of a series of distributions in complete cancellation or redemption of all or a portion of its [shares of] stock." We think that this was the intendment of Congress in enacting the provisions, except in a case where a corporation is in liquidation and the distribution made pro rata to the stockholders is one of a series of distributions in complete liquidation of the corporation. The distribution made by Inter-Island in 1934 and here in question was not one of a series of distributions in "complete cancellation or redemption" of all or any part of the shares of stock of the corporation.

What is meant by the word "liquidation" as used in subsections (c) and (i) above?

In *W. E. Guild*, 19 B. T. A. 1186, 1202, we said:

The word "liquidation" when applied to a partnership or company has a general meaning, well recognized by textwriters and courts, as the operation of winding up of its affairs by realizing its assets, paying its debts and appropriating the amount of profit or loss. 37 Corpus Juris 1265; *Assets Realization Co.* v. *Howard*, 127 N. Y. S. 798; *Gibson* v. *American Rwy. Express Co.*, 195 Iowa 1126; 193 N. W. 274; *Rohr* v. *Stanton Trust & Savings Bank*, 76 Mont. 248; 245 Pac. 947; *Gilna* v. *Barker*, 78 Mont. 357; 254 Pac. 174; *Lafayette Trust Co.* v. *Beggs*, 213 N. Y. 280; 107 N. E. 644; *In Re Union Bank of Brooklyn*, 161 N. Y. S. 29.

In *Hellman* v. *Helvering*, 68 Fed. (2d) 763, it was said that:

* * * In its generally accepted meaning a dividend in liquidation means an act or an operation in winding up the affairs of a firm or corporation, a settling with its debtors and creditors, and an appropriation and distribution to its stockholders ratably of the amount of profit and loss. * * *

See also *Rheinstrom* v. *Conner*, 33 Fed. Supp. 917; *Northwest Bancorporation* v. *Commissioner*, 88 Fed. (2d) 293. In *Tate* v. *Commissioner*, 97 Fed. (2d) 658, it was said that: "Whether a dividend is a 'distribution in liquidation' is a question of fact, and depends upon the intent of the directors of the corporation."

In the instant case there was no plan afoot and there was no intention on the part of the directors and stockholders of Inter-Island to wind up the affairs of that corporation. All that was undertaken was to distribute a portion of the accumulated earnings and profits of the company which were not needed in the normal course of its business. This was in no sense a liquidation as that term has been generally construed. The case of *Bynum* v. *Commissioner* (C. C. A., 5th Cir.), 113 Fed. (2d) 1, is distinguishable on the facts. There the distribution was made to the stockholders out of the proceeds from the sale of a substantial portion of its capital assets and pursuant to a resolution to liquidate. The court held, reversing 40 B. T. A. 336, that the evidence showed a bona fide undertaking to liquidate the corporation and that the indorsement of the dividend on the stock certificates "canceled and redeemed them to that extent." Here the distribution was not made out of the proceeds from the sale of any capital asset and there was no undertaking or intention to liquidate the corporation.

In *John B. Stewart*, 29 B. T. A. 809, 813, we said:

\* \* \* It is entirely possible that a corporation could distribute such a large percentage of its net assets and reduce the par value of its shares with no thought of liquidation of its business or stock or of winding up the corporate existence. It could with what was left have a purpose of carrying on a more limited business indefinitely. In addition to this, the question would be controlled by the statutory definition of partial liquidation, section 115 (h) [section 115 (i) in the 1934 Act], and it may be seriously doubted, without deciding, whether the reduction in par value of all the outstanding shares can be said to be a "complete cancellation or redemption of a part of its stock" and whether, in the absence of evidence that a complete winding up is in contemplation, such a distribution and reduction of par value can be said to be "one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." We hold, however, that because of the inadequate evidence the respondent's contention that this was a distribution in partial liquidation can not be sustained.

In *Patty* v. *Helvering* (C. C. A., 2d Cir.), 98 Fed. (2d) 717, the question before the court was whether a distribution made by a corporation concurrently with the reduction in the par value of the shares of stock from $100 to $70 was a partial liquidation within the meaning of section 115 (i) of the Revenue Act of 1928, which provision of law is the same as in the Revenue Act of 1934. The facts in the case were that a corporation had capitalized earnings of prior years through stock dividends. In 1928 the corporation reduced the par value of its shares of stock from $100 to $70 and distributed the

reduction in par value as a dividend to its stockholders. The court reversed the decision of the Board based upon a memorandum opinion and held that the distribution was a partial liquidation of the stock of the corporation within the meaning of the statute. In its opinion the court stated:

* * * (The Commissioner does not assert that the distributions at bar were not "in complete cancellation or redemption" of a part of the company's shares, and arguendo we therefore assume that they were). * * *

The court further stated:

* * * Therefore we hold that if redeemed shares have been issued bona fide, § 115 (g), 26 U. S. C. A. § 115 (g), never applies. There is no possibility of abuse in this, for § 115 (b), 26 U. S. C. A. § 115 (b), controls the marshalling of earnings, and ex proprio vigore allocates all distributions against them so long as there are any. We do not therefore agree with the reasoning of such cases as *Hill* v. *Commissioner*, 4 Cir., 66 F. 2d 45, which upheld the taxation of distributions of liquidating shares which concededly had been issued for business purposes; though there are other decisions which seem to support such an interpretation. *Randolph* v. *Commissioner*, 5 Cir., 76 F. 2d 472; *Brown* v. *Commissioner*, 3 Cir., 79 F. 2d 73; *McGuire* v. *Commissioner*, 7 Cir., 84 F. 2d 431; *Parker* v. *United States*, 7 Cir., 88 F. 2d 907. We shall continue to follow *Commissioner* v. *Quackenbos*, *supra*, 78 F. 2d 156, until the Supreme Court makes authoritative a different interpretation. In the case at bar there can be no suggestion that the stock dividends of 1913, 1917 and 1925 were not issued in due course of business.

The views expressed in the above mentioned opinion of the Second Circuit seem to us to be directly contrary to the views expressed by numerous other Circuit Courts of Appeal, particularly, *Hyman* v. *Helvering*, (App. D. C.), 71 Fed. (2d) 342. In that case the court said:

* * * Undoubtedly the tax law recognizes a distinction between liquidating dividends and dividends out of profits, and provides a different basis on which to tax them. The purpose of Congress in the inclusion of (g) was to narrow the distinction to the end that corporations might not by resort to the device of stock redemption or cancellation make a distribution to its shareholders essentially resulting in a division of profits. * * *

See also *Flanagan* v. *Helvering* (App. D. C.), 116 Fed. (2d) 937.

It seems to us that if a corporation may reduce the par value of its shares of stock at a time when it has a surplus sufficient to make a distribution to its stockholders and regard such a distribution as a partial liquidation within the meaning of section 115 (c) and (i), section 115 (b) is not given due weight. That section provides that "For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits."

As indicated above, no contention is made that Inter-Island did not have surplus earnings available for the distribution made in 1934 here in question.

In their briefs, and particularly that of the petitioners, the parties have devoted a considerable portion of their argument to the effect of section 115 (g). It is plain, however, that that section has no application to the facts here, for the very reason that there was no cancellation or redemption of any shares of stock of the corporation. The discussion in the briefs as to whether the distribution was "at such time and in such manner" as to make it essentially equivalent to a taxable dividend within the meaning of subsection (g) is beside the question.

We hold in the circumstances of the case that the distribution in question was an ordinary dividend taxable to the stockholders at the regular dividend rates.

## Issue 2.

FINDINGS OF FACT.—The Pacific Guano & Fertilizer Co., hereinafter sometimes referred to as Pacific Guano, is an Hawaiian corporation with its principal office in Honolulu. It was organized May 23, 1890, for the purpose, among others, of engaging in the general business of procuring, preparing, manufacturing, transporting, and dealing in phosphates and other fertilizing materials. It had several branch offices or partially owned subsidiary companies in California. It was capitalized at $100,000, with 1,000 shares of stock of a par value of $100 each. Its stockholders include about 24 corporations and tax-exempt organizations and about 150 individuals and trusts.

Changes were made in the company's capitalization from the date of organization up to the present time as follows:

| | |
|---|---|
| May 23, 1890 | Subscribed and issued 1,000 shares, par value $100,000 |
| Feb. 16, 1893 to | |
| June 30, 1896 | Issued and sold for cash 2,000 shares |
| Aug. 20, 1900 | Stock dividend, issued 2,000 shares |
| June 30, 1905 | Issued and sold for cash 2,000 shares |
| 1907 | Issued and sold for cash 1,750 shares |
| Dec. 30, 1911 | Stock dividend, issued 1,250 shares |
| Apr. 27, 1922 | Stock dividend, issued 14,200 shares |
| Apr. 27, 1922 | Issued in exchange for assets of Hawaiian Fertilizer Co., Ltd., 17,800 shares |
| Apr. 30, 1930 | Stock dividend, issued 10,500 shares |
| July 1, 1930 | Issued and sold for cash 1,000 shares |
| Oct. 1, 1930 | Issued and sold for cash 250 shares, leaving outstanding 53,750 shares of a par value of $5,375,000 |
| Aug. 22, 1935 | Reduction in par value of stock from $100 to $70 per share authorized, and on Sept. 30, 1935, distribution made of $30 per share to shareholders |

Over the period 1913 to 1922 there was an increase of $785,000 in the assets of the company and an increase of over $800,000 in its surplus.

In 1922 Pacific Guano acquired all of the assets of the Hawaiian Fertilizer Co., Ltd., in exchange for 17,800 shares of its stock of a par value of $1,780,000, which was the appraised value of the assets acquired. The appraised value of Pacific Guano's assets at that time was $2,420,000. On the same date Pacific Guano issued a stock dividend of 14,200 shares (142 percent), so that the stockholdings of its stockholders would have a par value equal to the net assets of Pacific Guano prior to the acquisition of the assets of the Hawaiian Fertilizer Co., Ltd. Those are the capital transactions shown above under date of April 27, 1922.

There was an increase in Pacific Guano's gross sales in Hawaii over the ensuing several years of from approximately 75,000 tons in 1922 to 162,000 tons in 1929. Plans for extension of the plant in Hawaii and the erection of plants on some of the other islands were under consideration. An additional plant had been constructed on the Island of Hawaii at Hilo in 1926 and the construction of another on the Island of Maui was begun in 1931. Also over the period 1922 to 1929 there were increases of approximately $1,800,000 in the company's assets and approximately $1,500,000 in surplus.

The stock dividend of 25 percent, 10,500 shares, shown above under date of April 30, 1930, was for the purpose, as declared in the authorizing resolution of the stockholders dated March 20, 1930, of adding such increased surplus to fixed capital. Later during 1930, 1,250 additional shares of stock were issued and sold for cash pursuant to further authorization contained in the resolution of March 20, 1930. The shares were sold for $160 each, or a total of $200,000, of which amount $125,000 was credited to capital and $75,000 to paid-in surplus.

There was a steady increase in Pacific Guano's volume of business from the date of its inception up to about 1929. Gross sales of fertilizers in Hawaii increased from approximately 34,000 tons in 1913 to 163,000 tons in 1930. Over the same period gross sales in California increased from approximately 26,000 tons in 1913 to approximately 50,000 tons in 1928, falling off to approximately 49,000 tons in 1929 and 47,000 tons in 1930. After 1929 there was a gradual decline in total gross sales from approximately 211,000 tons in 1929 to 148,500 tons in 1935. Correspondingly, gross sales, in terms of dollars, increased from approximately $7,000,000 in 1922 (the figures for prior years are not available) to a high of approximately $10,000,000 in 1929 and fell off to approximately $5,500,000 in 1932, 1933, and 1934. Earnings from operations were approximately $700,000 in 1922, $1,070,000 in 1929, and $397,000 in 1934. This decrease in business was due in part to general conditions of world trade and in part to a change in the practice of many of the company's customers from purchasing mixed or manufactured fer-

tilizers to purchasing the ingredients in bulk or unmixed form directly from the carrier. There was also a change in the nature of the fertilizers used to more concentrated products, which tended to cut down the tonnage business.

The financial position of Pacific Guano over the period 1929 to 1935 is shown by the following figures taken from the consolidated balance sheets:

|  | Dec. 31, 1929 | Dec. 31, 1930 | Dec. 31, 1934 |
|---|---|---|---|
| ASSETS: | | | |
| Cash | $680,333.68 | $1,071,618.05 | $2,344,662.13 |
| Fertilizer and supplies | 2,678,245.53 | 2,430,822.03 | 1,492,381.19 |
| Other current assets | 718,795.38 | 771,213.15 | 601,161.83 |
| Prepaid expenses, etc | 21,794.37 | 19,879.55 | 17,556.91 |
| Fixed assets | 2,675,815.31 | 2,823,268.41 | 2,155,010.65 |
| Miscellaneous assets | 614,447.03 | 603,355.52 | 242,695.20 |
| Total | 7,389,431.30 | 7,720,136.71 | 6,853,467.91 |
| LIABILITIES: | | | |
| Current liabilities | 642,780.18 | 431,410.44 | 327,129.43 |
| Deferred credits | 40,156.53 | 42,318.29 | 27,136.99 |
| Depreciation reserves | 728,617.45 | 857,577.56 | 844,540.42 |
| Other reserves | 64,339.73 | 173,021.53 | 127,601.16 |
| Capital Stock | 4,200,000.00 | 5,375,000.00 | 5,375,000.00 |
| Paid-in surplus | | 75,000.00 | 75,000.00 |
| Earned surplus | 1,713,537.41 | 765,808.89 | 77,059.91 |
| Total | 7,389,431.30 | 7,720,136.71 | 6,853,467.91 |

Inventories consisting of fertilizers and supplies reflected in the "current assets" increased from $704,663.37 in 1921 to $2,678,245.53 in 1929, and decreased to $1,492,381.19 in 1934.

In 1932 there was written off in the books of Pacific Guano a loss of approximately $544,000 representing investment in a California subsidiary company, a further loss of approximately $65,500 of bad debts in California, and a further loss of approximately $215,000 of obsolescence on superphosphate and sulphuric acid plants.

Substantial dividends of from 8 percent to 15 percent were paid by Pacific Guano in all of the years from 1913 to 1935, inclusive. The dividends increased from $100,000 in 1913 to $252,000, in 1922 and $563,500 in 1930. They were reduced to $430,000 in 1931, $215,000 in 1932, $322,500 in each of the years 1933 and 1934, and $258,000 in 1935.

A proposal to reduce the par value of the company's stock was discussed at a meeting of the directors of Pacific Guano held on December 23, 1932. The minutes of that meeting read in part as follows:

Mr. Phillips [general manager] stated that according to present estimates the Company should have approximately $1,250,000.00 in cash available on February 1st, 1933 and suggested that it might be advisable to consider a reduction of the Company's capital stock by means of a distribution of $10.00 per share from capital. Following brief discussion, it was decided by common consent that action relative to this matter be deferred for the time being.

On August 22, 1935, the stockholders authorized a reduction in the par value of the company's stock from $100 to $70 per share, or a total reduction in capitalization of $1,612,500, and a pro rata distribu-

tion of that amount in cash to the stockholders. Such distribution was made on September 30, 1935, the petitioner Gaylord P. Wilcox receiving $54,300 on 1,810 shares, the petitioner Elsie H. Wilcox receiving $13,200 on 440 shares, and petitioner Mabel I. Wilcox receiving $14,100 on 470 shares.

• There was no intention on the part of the directors and stockholders in 1935 to liquidate the corporation, either in whole or in part, or materially to curtail its business activities. The purpose of the reduction in capital was to distribute to the stockholders a portion of the accumulated earnings which were not required in the conduct of the business.

The distribution which Pacific Guano made to the petitioners on September 30, 1935, was an ordinary taxable dividend distribution within the meaning of section 115 (a) of the Revenue Act of 1934.

, OPINION.—In this issue the question presented differs little from that considered in issue 1, above, and the same reasoning applies. Over a long period of years the company's earnings were greatly in excess of the dividends paid. The current assets at December 31, 1929, amounted to $4,077,374.59 and its earned surplus to $1,713,537.41. Although the company's officers testified that in 1930 they did not have in mind a distribution to the stockholders at a later date of any part of the earnings capitalized through the stock dividend in 1930, there would appear to be no sound business reason for the payment of the stock dividend. By 1935 the company found that it had no need for the money which had been capitalized through the issuance of the stock dividend. The action taken in 1935 was in a very real sense the reversal of the action taken in 1930. In these circumstances we think that the respondent did not err in his determination that the distribution made to the stockholders in 1935 and here in question was made at such time and in such manner as to be equivalent to the payment of a taxable dividend within the meaning of section 115 (g) of the statute. See *Flanagan* v. *Helvering*, *supra*, and cases cited therein. Cf. *E. M. Peet*, 43 B. T. A. 852.

## Issue 3.

FINDINGS OF FACT.—George' N. Wilcox, uncle, of petitioners, died January 21, 1933, at the age of 92, a resident of Lihue, County of Kauai, Territory of Hawaii, leaving. a last will and testament in which he bequeathed the residue of his estate to the three petitioners, his nephew and nieces, in trust to pay the income from certain assets of the residuary estate, namely, shares of stock of Grove Farm Co., Ltd., to his grandnephews and grandnieces and to pay the "net income from the residue" in equal shares to his "nephews and nieces", among whom were the petitioners. The trust was to terminate upon the death

of the last surviving nephew or niece and the remainder of the trust estate was then to be distributed to the testator's grandnephews and grandnieces.

Petitioner Gaylord P. Wilcox was named executor of decedent's will and on February 21, 1933, on his petition to the Probate Court, letters testamentary were issued to him as executor of the estate and to the Bishop Trust Co., Ltd., as administrator c. t. a.

The administration of the estate was closed during 1934 and on February 17, 1934, an order was entered in the Probate Court approving the final account, ordering the discharge of the executor and administrator, and decreeing distribution of the estate. Pursuant to such order the executor and administrator on March 22, 1934, delivered all of the remainder of the estate to the petitioners Mabel I. Wilcox, Elsie H. Wilcox, and Gaylord P. Wilcox, as trustees under the decedent's will.

Income tax returns for the decedent's estate during the process of administration were filed by the executor and administrator upon the cash receipts and disbursements basis and for the calendar year. Such returns on Forms 1041 and 1040 for the taxable year begun January 21, 1933, and ended December 31, 1933, were duly filed with the collector for the district of Hawaii, at Honolulu. Similar returns were filed for the period from January 1, 1934, to March 1, 1934, the close of the period of administration of the estate.

Following is a statement of the receipts and disbursements of the estate over the period from January 1, 1934, to the close of the period of administration:

| | Capital. | Income |
|---|---|---|
| Cash in hand, January 1, 1934 | $2,866.14 | $68,161.32 |
| Receipts: | | |
| Dividends, domestic corporations | | 8,916.00 |
| Interest, bonds, exempt | | 77.25 |
| Reimbursement of inheritance taxes | | 3,097.86 |
| Sales: | | |
| Bonds | 18,952.50 | |
| Stocks | 4,725.00 | |
| | 26,543.64 | 80,252.43 |
| Disbursements: | | |
| Administration expenses | 913.80 | |
| Executor's commissions | 23,619.77 | 9,035.87 |
| Legal expenses | 1,000.00 | |
| Repairs | | 88.41 |
| Taxes | 891.64 | 94.13 |
| | 26,425.21 | 9,218.41 |
| Distributions to testamentary trustees | 118.43 | 71,034.02 |

Thereafter, on September 17, 1935, the testamentary trustees paid to the territorial treasurer $45,330.81 additional inheritance tax, and on November 12, 1935, paid to the collector $85,538.70 additional estate tax and $8,886.65 interest thereon, a total of $139,756.16, which was assessed against the executor and administrator.

The return filed on behalf of the estate for the period from January 1 to March 1, 1934, showed a net loss of $1,753.14. The respondent determined that the estate had a net income of $7,844.06. Among a number of other adjustments which are not contested, the respondent disallowed the deduction of $8,146.33 representing a portion of the executor's commissions in the total amount of $9,035.87 claimed as a deduction in the return. The amount disallowed by the respondent, $8,146.33, was the portion of such commissions which was shown in the executor's and administrator's accounts to have been due and payable on December 31, 1933, on income received by the estate in that year.

In his deficiency notices to these petitioners for the calendar year 1934 the respondent has determined that Mabel I. Wilcox, Elsie H. Wilcox, and Gaylord P. Wilcox are taxable as beneficiaries of the estate on their distributive shares of the income of the estate for 1934 in the amounts of $910.61, $943.37, and $918.99, respectively.

During the calendar year 1934 there was not paid to any of the taxpayers nor were they or any of them credited on the books of Gaylord P. Wilcox, executor, and Bishop Trust Co., Ltd., administrator, with any part of the income or property of said estate.

OPINION.—Petitioners contend, first, that they are not taxable on any income of the George N. Wilcox estate for the period from January 1 to March 1, 1934, the close of the period of administration of the estate, and that the income of the estate, if any, is taxable to the executor and administrator. They further contend that the estate had no taxable income for its taxable year 1934 and that the respondent erred in determining the income of the estate for that year.

In the circumstances of this case we do not think that it is necessary to consider whether the estate of George N. Wilcox in process of administration for the period from January 1 to March 1, 1934, had a net income. Both the estate and the petitioners were on the cash receipts and disbursements basis. If the petitioners did not receive any part of the net income, albeit it was not legally deductible from the gross income, we do not see how the petitioners as individuals are liable to any income tax upon income received. If the estate had a net income during this period, the petitioners as trustees may be liable to tax as transferees of the residuary estate. But the respondent has not determined any tax liability against them as trustees. We do not have the trust before us.

The stipulation of the parties is that there was not paid to the petitioners or any of them during 1934 any part of the income or the property of the estate. The determination of the respondent that they, as individuals, received taxable income from the estate of George N. Wilcox upon the distribution of the estate to them as trustees is reversed.

*Issue 4.*

FINDINGS OF FACT.—Emma Lyman Wilcox, mother of the petitioners, died a resident of Lihue, Kauai County, Territory of Hawaii, July 28, 1934, at the age of 85, leaving a will which was admitted to probate on September 4, 1934. After making certain specific bequests the will provided that:

All the residue of my property of every kind and description I devise and bequeath to my children in equal shares, the issue of my son Charles Henry Wilcox and of any other deceased child of mine taking the share of such child by right of representation.

The Bishop Trust Co., Ltd., of Honolulu, was duly appointed administrator c. t. a., pursuant to a petition filed by the three children, the petitioners herein. The administration of the estate was closed during 1935 and on May 28, 1935, an order was entered by the Probate Court approving the final account of the administrator and directing the distribution of the remainder of the estate to the residuary legatees in accordance with the provisions of the decedent's will. Such distribution was made during the period from June 18 to July 5, 1935, each of the petitioners herein receiving certain personal property, consisting principally of shares of stock of corporations and $1,973.90 cash.

The receipts and disbursements of the estate during the period from January 1 to July 5, 1935, the date of final distribution, were as follows:

| | Capital | Income |
|---|---|---|
| Cash in hand, Jan. 1935 | $4,945.40 | $22,621.65 |
| *Receipts:* | | |
| Bank certificates of deposit redeemed, bank savings account transferred | 117,087.50 | |
| Dividends | 94.05 | 12,439.97 |
| Interest: | | |
| Bank | | 861.52 |
| Bonds | 10.83 | 228.62 |
| Proceeds, sales of stocks and bonds | 14,272.40 | |
| | 136,410.18 | 36,151.76 |
| *Disbursements:* | | |
| Bank certificates of deposit purchased | 39,000.00 | |
| Debts of decedent | 1,414.19 | |
| Legacies | 15,000.00 | |
| Administration: | | |
| Advertising | 10.00 | |
| Commissions | 7,885.84 | 1,937.58 |
| Fees: | | |
| Attorney | 1,200.00 | |
| Court a/c | 8.35 | |
| Master | 250.00 | |
| Notary | 1.25 | |
| Radiogram | 6.00 | |
| Taxes: | | |
| Federal estate | 77,130.89 | |
| Territorial inheritance | 17,228.99 | |
| Documentary | 184.58 | |
| Federal income: | | |
| Paid | | 934.77 |
| Reserved | | 500.00 |
| | 159,320.09 | 3,372.35 |
| Difference between cash receipts and disbursements | (22,909.91) | 32,779.41 |
| Excess of income receipts | 9,869.50 | |

The administrator c. t. a. elected to file the income tax return on behalf of the estate on the calendar year basis and on the cash receipts and disbursements basis, reporting for the taxable year 1935 a net income for the estate of $11,330.52 and an income tax liability of $323.14, which amount was duly paid to the collector in Honolulu. In such return no deduction from gross income was claimed under the provisions of section 162 (c) of the Revenue Act of 1934 in respect of the distributions made to the petitioners as residuary legatees. In their individual income tax returns the petitioners did not include in their taxable income any of the amounts of cash which were distributed to them by the estate in that year.

The respondent has determined in his deficiency notice to each of the petitioners in these proceedings that:

Dividends in the amount of $1,973.90 distributed by the Estate of Emma L. Wilcox, are held to be taxable to you as an heir of the estate.

OPINION.—The petitioners contend that they are not taxable in 1935 on any of the amounts distributed to them by the Emma Lyman Wilcox estate in that year; that such distributions, both as to capital and income of the estate, were made to them as residuary legatees under the testator's will and were received by them as nontaxable legacies.

Under the provisions of section 22 (b) (3) of the Revenue Act of 1934 there is exempted from gross income "the value of property acquired by gift, bequest, devise or inheritance", with the proviso "(but the income from such property shall be included in gross income)." Section 162 of the same act provides in material part as follows:

The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that—

\*      \*      \*      \*      \*      \*      \*

(b) There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the beneficiaries, and the amount of the income collected by a guardian of an infant which is to be held or distributed as the court may direct, but the amount so allowed as a deduction shall be included in computing the net income of the beneficiaries whether distributed to them or not. Any amount allowed as a deduction under this paragraph shall not be allowed as a deduction under subsection (c) of this section in the same or any succeeding taxable year;

(c) In the case of income received by estates of deceased persons during the period of administration or settlement of the estate, and in the case of income which, in the discretion of the fiduciary, may be either distributed to the beneficiary or accumulated, there shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year, which is properly paid or credited during such year to any legatee, heir, or beneficiary, but the amount so allowed as a deduction shall be included in computing the net income of the legatee, heir, or beneficiary.

In interpreting these provisions of law the respondent by Regulations 86, article 162–1, has provided in material part as follows:

From the gross income of the estate or trust there are also deductible (either in lieu of, or in addition to, the deductions referred to in the preceding paragraph of this article) the following:

\* \* \* \* \* \* \*

(2) Any income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to a beneficiary, whether or not such income is actually distributed.

(3) Any income of the estate of a deceased person for its taxable year which is properly paid or credited during such year to a legatee or heir, and any income either of such an estate or of a trust for its taxable year which is similarly paid or credited during that year to a legatee, heir, or beneficiary *if there was vested in the fiduciary a discretion either to distribute or to accumulate such income.*

\* \* \* \* \* \* \*

The tax upon the net income of the estate or trust shall be paid by the fiduciary (see section 161 (b)). If the tax has been properly paid on the net income of an estate or trust, the net income on which the tax is so paid is not, in the hands of the distributee thereof (the legatee or the beneficiary), taxable as income to him. [Emphasis supplied.]

From our findings it will be seen that the estate of Emma Lyman Wilcox for the period January 1 to July 5, 1935, recognized that it had taxable income. It filed a return of such net income and paid the tax legally due thereon. As we understand the respondent's contention it is that the estate during such period of administration is not subject to tax upon its net income because pursuant to a court decree settling the estate it was paid over to the residuary legatees.

That the net income of an estate in process of administration or settlement is liable to income tax is not questioned. Either the estate or the beneficiary to whom the net income is distributed is liable for the tax. See *Helvering* v. *Butterworth*, 290 U. S. 365. In the instant proceedings the petitioners contend that the estate is liable for the tax. It made a return upon such net income and paid the tax due thereon. It is the respondent's contention that the estate is not liable for the tax but that the beneficiaries are liable—not for a tax upon the net income of the estate but only upon such portion of the net income as was received by the residuary legatee in the form of cash.

This contention of the respondent appears to us to be directly contrary to his regulations. Paragraph (3) of article 162–1 of the regulations above quoted was clearly intended to cover section 162 (c) of the statute. The estate in process of administration is liable for tax upon its net income to the end of the period of administration unless "there was vested in the fiduciary a discretion either to distribute or to accumulate such income."

In the instant proceeding there was no authority vested in the executor by the terms of the will of the decedent to distribute the income of the estate to the residuary legatees. At the close of the administration period the entire proceeds of the estate, after the deduction of legacies and the payment of all expenses, pursuant to the court decree were paid over to the residuary legatees. What they received was their legacies. What they received was clearly exempt from income tax in accordance with the Commissioner's regulations, which we think correctly interpret the law.

The same question presented here was before the Board in the case of *S. F. Durkheimer*, 41 B. T. A. 585. We there held that the residuary legatee receiving his legacy pursuant to a court order at the close of the period of administration was not liable to income tax in respect of any part of the legacy. We see no reason to reach a different conclusion here. The action of the respondent upon this issue is reversed.

*Issue 5.*

FINDINGS OF FACT.—The petitioner, Gaylord P. Wilcox, on November 3, 1930, transferred in trust to the Bishop Trust Co., Ltd., a large number of shares of stock of various corporations, certain insurance policies, and his private stamp collection. Under the trust agreement the trustee was given broad powers of management and control over the property and was directed "to pay the net income thereof or such part thereof as he may require at any time to the Settlor during his lifetime, all net income not so paid to the Settlor to be added to the capital of the trust estate at the end of each calendar year." The trust was to continue for a limited period after the settlor's death for the benefit of his wife, if she should survive him, and children and grandchildren. There was a further provision that if during the existence of the trust any emergency should arise the trustee in his discretion might pay out a limited amount of the trust corpus to or for the benefit of any of the beneficiaries. The settlor reserved the power to alter or amend the trust with the consent of the trustee, the settlor's wife, and adult children. Also, the settlor reserved the right, with the consent of the trustee, to appoint himself or his nominee as a cotrustee of the trust, and pursuant to such power did appoint himself a cotrustee with the Bishop Trust Co., Ltd., on November 5, 1930.

Among the properties transferred to the trust by the settlor at the time of its creation were 2,307 shares of stock of the Inter-Island Steam Navigation Co., Ltd., and 500 shares of stock of the Pacific Guano & Fertilizer Co. During 1931 the trust purchased 193 additional shares of Inter-Island stock for $3,590.60. During 1934 it thus owned 2,500 shares of Inter-Island stock and as such stock-

holder it received in December of that year $5,000 of the cash distribution which that corporation made to its stockholders on December 22, 1934, as more fully described in issue 1 above.

Also, during 1935, the trust was the owner of 500 shares of stock of Pacific Guano and received from that company $15,000 as its distributable share of the cash distribution made by that company to its stockholders on September 30, 1933, as more fully described in issue 2 above.

No part of the above amounts distributed to the trust by Inter-Island and by Pacific Guano in 1934 and 1935 has ever been paid or credited to the settlor, Gaylord P. Wilcox.

In his deficiency notice to Gaylord P. Wilcox the respondent has determined that that petitioner is taxable in 1934 and 1935 upon the distributions made to the Gaylord P. Wilcox trust by Inter-Island and Pacific Guano in those years. The petitioner, Gaylord P. Wilcox, alleges in his petition that the respondent erred in including those amounts in his income.

OPINION.—Section 167 of the Revenue Act of 1934 provides in part that—

SEC. 167. INCOME FOR BENEFIT OF GRANTOR.

(a) Where any part of the income of a trust—

\*          \*          \*          \*          \*          \*          \*

(2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; \* \* \*

\*          \*          \*          \*          \*          \*          \*

then such part of the income of the trust shall be included in computing the net income of the grantor.

All of the income of the trust here under consideration was distributable to the settlor, Gaylord P. Wilcox, and unquestionably all of the income of the trust for 1934 and 1935 is taxable to him in those years. The petitioner's contentions in this issue are that the distributions made to the trust by Inter-Island and Pacific Guano were not dividend distributions and did not constitute income to the trust. These questions have both been resolved 'against the petitioners in issues 1 and 2 above.

The respondent's determination that the petitioner is liable to tax on the $5,000 distributed to the Gaylord P. Wilcox trust by Inter-Island in 1934 and on the $15,000 distributed to the trust by Pacific Guano in 1935 is sustained.

Reviewed by the Board.

*Decisions will be entered under Rule 50.*