Estate of Edward B. Alford, Deceased, Mary D. Alford, Executrix v. Commissioner. Martha A. Alford v. Commissioner.
Estate of Alford v. Commissioner
Docket Nos. 112501 and 112502.
United States Tax Court
1944 Tax Ct. Memo LEXIS 329; 3 T.C.M. (CCH) 232; T.C.M. (RIA) 44082; March 15, 1944
*329 W. Sidney Felton, Esq., 1 Federal St., Boston, Mass., for the petitioners. A. T. Haslam, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge. In these two consolidated proceedings the controversy results from respondent's determination of deficiencies of $3,853.43 and $385.45 in the income tax of Edward B. Alford (deceased) for the years 1937 and 1939, respectively, and a deficiency of $3,646.82 in the income tax of Martha A. Alford for the year 1937. The primary issue presented is the proper characterization under section 115 of the applicable revenue laws of various distributions by a corporation to its stockholders. An issue relating to the deduction of certain expenses by Martha A. Alford has been stipulated. Findings of Fact These cases were presented on a stipulation of facts and on a record at the hearing. Those facts which have been stipulated we hereby find accordingly. Those facts appearing below which are not from the stipulation we find from the record. Edward B. Alford (deceased), whose estate is one of the petitioners here, acquired 845 shares of the Otis Company prior to 1930. The other petitioner, Martha A. Alford, similarly acquired *330 886 shares of stock in the Otis Company before 1930. This company was organized in 1840 to manufacture cotton textiles, and it continued in that business throughout its existence. In 1927 it had in operation four different plants, the Ware Mill at Ware, Massachusetts; the Palmer Mill at Palmer, Massachusetts; the Columbian Mills at Greenville and New Ipswich, New Hampshire (these two mills being regarded as a single plant), and the Boston Duck Mill at Palmer, Massachusetts. The Ware Mill was subdivided into a "piece-goods" department and an "underwear" department and the Boston Duck Mill was divided into a "manufacturing" plant and a "finishing" plant. Each of the above plants was operating more or less independently of the others, except for the common management. Otis suffered losses in the years 1924, 1925, and 1926. In 1926 Henry G. Nichols was brought into the company as its chief executive officer. At that time the company had large borrowings and was currently losing money. Nichols evolved a plan to remedy this condition. The plan envisaged the sale of the Ware plant and the acquisition of another plant in the South. The purpose of the plan was to increase business and reduce *331 indebtedness. It did not contemplate any liquidation of the company nor distribution of any amount to its stockholders. The stockholders at a meeting of January 5, 1927, gave the directors authority to rearrange the company's business and to dispose of any of its assets. Authority was given the directors to act upon the plan in such manner "as they think best." They were specifically authorized to close or sell the Columbian plant, the Ware plant, and the underwear business, and generally authorized to sell or otherwise dispose of any other property. The purpose of the stockholders' action of January 5, 1927, was to improve the financial status of the company, not to liquidate it. In March, 1927, the directors approved the sale of the underwear plant and at the same meeting they authorized the expenditure of $150,000 for new machinery in addition to the $100,000 spent earlier in the same fiscal year. Only a small portion of the Ware plant was devoted to the production of underwear. The underwear business, including the machinery water rights, good will, inventory and accounts receivable connected with it, was sold for some $800,000 in 1927. It was selected for disposition at that *332 time because it had not been particularly profitable; it required relatively large sums to be tied up in inventory; all the business, except underwear which was a knitting process, involved a weaving process, and the personnel of Otis was not well situated to engage both in a knitting and weaving manufacturing process at the same time; and it required a different kind of machinery than the other plants. Immediately following the sale of the underwear business, on April 2, 1927, the company had outstanding $1,110,000 in notes payable. The money received from the sale was placed in the company's general bank account and this indebtedness was reduced. At the time the company sold the underwear business in 1927 there was no thought of paying out the proceeds of that sale to the stockholders. The years 1927, 1928, and 1929 were all profitable years. The last part of 1930 caused the company to operate at a loss for that year. On September 27, 1930, a balance sheet of the company showed no notes outstanding. It also showed as cash assets, including cash on hand and in banks, time deposits, acceptances due before November 30, 1930, and notes receivable before the following June 2 slightly *333 over $1,800,000. This cash position was due to a reduction in receivables and inventory and the fact that full depreciation allowances were not expended on machinery. On October 27, 1930, the president of Otis addressed a letter to all stockholders attaching copies of balance sheets of September 28, 1929, and September 27, 1930. He explained a decreased net current asset position as due in large part to retirement of $400,000 of preferred stock at par, payment of common and preferred dividends of over $330,000, and the expenditure of $89,787 for purchase of 1,979 shares of the company's common stock. He noted an operating loss for the year of $109,233.72 due largely to a drop in the market price of cotton which resulted in a $90,000 reduction in closing inventory. In the letter he also stated: "In 1927 the Company sold its underwear plant at Ware and liquidated the business connected with it, the total amount realized being in excess of $800,000. In addition the Company has from time to time made smaller sales of other capital assets. "When the underwear business was sold the Company had a large debt and the Directors felt that the money might be needed in the Company's business. *334 In view of the present cash position of the Company and the probable requirements, the Directors are now of the opinion that a distribution out of these funds can be made. Since the funds represent money received from the liquidation of capital assets as above stated, the Directors feel that such a distribution should be accomplished only through a reduction in capital. Accordingly, they have voted to recommend the reduction of each share from the par value of $100 to the par value of $80, to be accomplished by the payment on December 1, 1930, of $20 per share to stockholders of record November 25, 1930. "On account of this proposed distribution, the Directors are inclined to base the declaration of dividends upon the result of current operations and business conditions. Accordingly, no quarterly dividend is declared at the present time." A meeting of the stockholders was called and the proposed distribution was approved. On December 1, 1930, a distribution of $20 per share was made and the $100 par value of the stock reduced accordingly. The distribution was charged to capital stock account on the books of Otis Company and the stock certificates were appropriately indorsed to *335 indicate the reduction in par value. Upon the date of the distribution the company had undistributed earnings accumulated since March 1, 1913, in excess of $2,800,000. The total amount of the distribution at the rate of $20 per share was $776,220. The board of directors of Otis, during the period March, 1927, through December, 1930, took the following actions in addition to those previously noted: In October, 1927, they authorized the expenditure of an additional $227,000 for new machinery. In March, 1928, they caused to be issued $400,000 par value preferred stock for cash, the stated purpose being to provide funds to purchase a manufacturing plant in the South provided a suitable plant could be obtained. That stock was subsequently called and retired in January, 1930, the stated reason being that the company had failed to find a suitable southern plant and had in the meantime accumulated cash beyond the needs of the business. In October, 1928, they authorized the expenditure of $280,000 for plant improvements and $60,000 for advertising. In July, 1929, they authorized a further expenditure of $60,000 for advertising. In October, 1929, they authorized the expenditure of $200,000 *336 on plant and equipment and on November 21, 1930, they authorized the expenditure of an additional $200,000 for buildings and machinery. At the time the $20 distribution was made in 1930 the company filed with the Commissioner of Internal Revenue an information return reporting that the distribution was a taxable dividend and upon inquiry it so advised its shareholders. Petitioner Martha A. Alford included the amount she received from this distribution in her Federal income tax return for 1930 and paid the tax thereon. The return was audited by respondent and the treatment accorded the Otis distribution was specifically noted and approved in the revenue agent's report. In a return of March 4, 1931, for the calendar year 1930 petitioner's decedent, Edward B. Alford, claimed the distribution a return of capital and not taxable. Subsequently, on April 6, 1931, he filed an amended return including the distribution as an ordinary dividend and paying the tax thereon. Both the original and the amended return were audited by respondent and the latter was accepted as correct. Petitioner's decedent, Edward B. Alford, continued to hold his stock in Otis throughout the years 1937, 1938, and *337 1939 and he received all the distribution made by the company in those years as described below. Petitioner Martha A. Alford also received the Otis distribution of January 20, 1937, described below, but thereafter sold her stock in 1937 and did not participate in other distributions. In computing gains of petitioners on distributions to be described respondent reduced the cost basis of each share by $20 on account of the December 1, 1930, distributions. At the time of the distribution of December, 1930, there was no intention to liquidate the company. With adjustments for the decline in market values the company continued to operate its business for the next few years on substantially the same basis that it operated before the distribution. During the fiscal years 1931 to 1937, inclusive, the Otis Company lost money in each year although in the years 1933 and 1936 it showed a profit before deduction for depreciation. It paid a dividend of two dollars a share in January, 1934, but paid no other dividends during fiscal years 1931 to 1936, inclusive. During the period following 1930 and through 1936 Otis spent some hundreds of thousands of dollars on plant equipment keeping up their *338 plants in all respects. The directors' records show the authorization of an expenditure of $200,000 for plant additions in 1931 and $50,000 in 1932, which was later increased to $100,000 in June, 1933. The company specifically authorized the purchase of two new sanforizing machines. In 1933 the board of directors authorized the expenditure of $247,000 on plant. Expenditures in this period were not as high as those made when the company was operating at a profit. The year 1935 was a particularly bad one for the company financially and the Palmer plant was a source of large part of the losses. Its product was a luxury one and the plant was closed in that year. Shortly after the Palmer plant was closed the company received an unsolicited offer to purchase the Palmer plant and the Boston Duck Mill. At that time the Duck Mill was operating normally, considering the depressed condition in the industry. In 1936 the board of directors recommended that the stockholders approve of a sale of the above two plants and in September, 1936, this suggestion was approved and the plants sold. In December, 1936, the directors recommended that the shareholders approve a distribution of $35 per share. *339 In January, 1937, the shareholders did approve, the $35 distribution was made, the par value of the stock was reduced accordingly, and the certificates appropriately indorsed. The money used to pay this distribution came from the sale of the Palmer and Boston Duck plants. At the time of the distribution the company had no earnings and profits accumulated since 1913. The company continued to operate the Ware and Columbian plants. At the time they were regarded as the two most desirable plants of the organization because of their products and their plant lay-outs. At the time of the January, 1937, distribution the president of Otis did not regard the company as in a state of liquidation, but felt that the company had reasonable prospects of profitable operations. Its business in early 1937 showed a distinct improvement. Early in 1937 the officers of Otis received an offer to purchase the Ware plant. Sometime prior to this, but after the January, 1937, distribution, Nichols, the chief executive officer of Otis since 1926, left the company to accept what he thought was a better job with another mill. He did not leave because he thought the Otis Company was a "gone goose," or was going *340 to be liquidated. He continued to serve as a director of the company. In September, 1937, the directors recommended that the shareholders approve the sale of the Ware plant and in November of that year such approval was given. The shareholders then approved two corporate distributions, one for $15 per share on November 23, 1937, and one for $13 per share on December 23, 1937. In each instance the distributions were charged to the capital stock account of the company and the par value of the stock reduced by endorsement on the certificates. The money for these distributions came from the sale of the Ware plant. The Columbian plant was in operation throughout 1937 and at the time of the distribution described above it was in full and continuing operation. It was the best operating plant the company owned as it was well located, enjoyed good labor relations, its product commanded a premium in the market and was sold to relatively few customers who could be depended upon to give what business they had to Otis. At the time Ware was sold Nichols thought the Columbian plant would continue profitable operations. The sale of the underwear business in 1927 was in no way related to any of *341 the sales in 1936 and 1937. The sales of capital assets in 1927, 1936, and 1937 were not part of a plan for liquidating the Otis Company. At the time of the 1937 distributions there was no intention to liquidate the company. On August 15, 1938, the shareholders approved a contract for the sale of the Columbian Mills. On October 4, 1938, the directors of Otis, after the Columbian Mills had been sold and paid for, and planning to distribute the assets pro rata among the stockholders in cancellation and redemption of their stock as soon as liabilities could be determined, recommended that the shareholders at their meeting on October 18, 1938, reduce the par value of the stock from $17 to $5 per share to allow a $12 distribution; authorize an immediate distribution of $4 per share; and authorize the directors to make further distributions when appropriate. At the meeting of October 18, 1938, the shareholders took action in accordance with these recommendations. On November 2, 1939, the board of directors took action to implement the final liquidation after the president had informed them that the outstanding liabilities had been determined. At that meeting it was: "Voted: That in pursuance *342 of the plan of liquidation which is as follows: * * *" to distribute all assets as soon as liabilities were settled, not later than September 30, 1942; in addition to $4 per share previously paid on October 25, 1938, to distribute $6.50 per share on November 15, 1939, upon presentation of stock certificates for proper endorsement, and to authorize the president of the company to take any steps necessary to effect the distribution. The distribution of 1939 was pursuant to a plan of complete liquidation. A final distribution of fifty cents a share was made on January 31, 1940, and immediately thereafter the company was dissolved. Opinion "Distribution in liquidation," as it is is used in section 115 of the Revenue Acts, is a phrase of art. W. C. Robinson, 42 B.T.A. 725, 735. Neither party contends that any payment except that made in 1939 was a distribution in "complete" liquidation, so that in considering the issues relating to the transactions of earlier years it is sufficient to consider the definition of a distribution in "partial liquidation." That definition did not vary between 1930 and 1939. It "means a distribution by a corporation in complete *343 cancellation or redemption of a part of its stock or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." There is no such redemption or cancellation unless some of the shares are completely redeemed or unless the distribution is made as one of a series looking toward complete redemption as, for example, where there is an intention eventually to liquidate the corporation in full. Mabel I. Wilcox, 43 B.T.A. 931, affirmed (C.C.A., 9th Cir.), 137 Fed. (2d) 136; John K. Beretta, 1 T.C. 86, affirmed (C.C.A., 5th Cir.), 141 Fed. (2d) 452; cf. Benjamin R. Britt, 40 B.T.A. 790, affirmed (C.C.A., 4th Cir.), 114 Fed. (2d) 10. A mere reduction in par value is not sufficient, though it may be made so if accompanied by an intention to dissolve the corporation. John K. Beretta, supra. As shown by our findings, we view the facts as demonstrating that there was no intention to liquidate the corporation as of 1930. Taken as a whole, the record *344 clearly demonstrates this. It follows that the distribution in 1930, a year not before us, was an ordinary dividend, there being sufficient earnings and profits to support it, and that it did not serve to reduce petitioners' basis. This treatment accords with the contemporaneous view taken both by petitioners and by respondent. The same reasoning would apply to the distributions in 1937, the first year in issue, were it not for the additional circumstance that by that time the corporation's earnings and profits had been exhausted. Since these distributions could not have been from earnings and profits and, accordingly, were not dividends under section 115 (a), and since they were distributions neither in complete nor in partial liquidation, they must have been "other distributions from capital," under subdivision (d), as to which the statute requires that the amount "shall be applied against and reduce the adjusted basis of the stock." See John K. Beretta, supra, 98. And if any part of them was in excess of that basis, "such excess shall be taxable in the same manner as a gain from the sale or exchange of property." Whatever gain over petitioners' *345 basis was realized in that year was accordingly taxable as a long-term capital gain, and petitioners' basis was reduced by the amount of the distributions. There was a further distribution in 1938, but that year is not in issue. We come then to the treatment applicable to 1939 by which time there is no doubt of the decision on the part of the owners and managers of the corporation to wind up its affairs and distribute its assets in full. Petitioners urge that the distribution in that year was one in complete liquidation and hence is taxable as a long-term capital gain. Respondent contends otherwise, basing his conclusion solely on the premise that the action in 1939 was but the culmination of the liquidating purpose entertained over many years. What we have already said disposes of this contention, since without the prior existence of an intention to liquidate there is no premise for it. Only a "complete liquidation" would entitle petitioners to the benefits of section 117, [1] but we do not understand respondent to urge that the corporation's plan of liquidation failed to conform to the statutory definition. Since the only reason advanced against it appears to us untenable, we accordingly *346 conclude that the gain from the 1939 distribution may be treated as a long-term capital gain. Decisions will be entered under Rule 50. Footnotes
1. "* * * Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation. For the purpose of the preceding sentence, 'complete liquidation' includes any one of a series of distributions made by a corporation in complete cancellation or redemption of all of its stock in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding, from the close of the taxable year during which is made the first of the series of distributions under the plan, (1) three years, if the first of such series of distributions is made in a taxable year beginning after December 31, 1937, or (2) two years, if the first of such series of distributions was made in a taxable year beginning before January 1, 1938." [Internal Revenue Code, section 115(c)↩.]